1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**Counsel for Plaintiff**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

VALERIE MORRISON, on behalf of herself, all others similarly situated, and the general public,

Plaintiff,

v.

JOHNSON & JOHNSON CONSUMER INC.,

Defendant.

Case No:   **'22CV1276 BEN RBB**

CLASS ACTION COMPLAINT

**COMPLAINT FOR FRAUD, CONSUMER FRAUD, BREACH OF WARRANTY, AND UNJUST ENRICHMENT**

DEMAND FOR JURY TRIAL

Plaintiff Valerie Morrison, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendant Johnson & Johnson Consumer Inc. ("J&J"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.      For decades, J&J has sold the ubiquitous, over-the-counter analgesic, Tylenol, designed to relieve pain. Many varieties, however, contain titanium dioxide ($TiO_2$), a heavy metal and artificial colorant that is harmful upon accumulation in the human body, including in the liver, spleen, kidney, brain, and lungs. Because J&J omits from the labeling of these Tylenol products material information regarding the safety concerns associated with consuming this toxin, its behavior is likely to deceive reasonable consumers.

2.      Plaintiff brings this action against J&J on behalf of herself, similarly-situated Class Members, and the general public, to enjoin its practice of deceptively omitting material information about safety concerns associated with the $TiO_2$ in certain Tylenol products, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

3.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from J&J.

4.      The Court has personal jurisdiction over J&J because it has purposely availed itself of the benefits and privileges of conducting business activities within California, specifically through distributing and selling Tylenol in California, and transactions giving rise to this action occurred in California.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because J&J resides (*i.e.*, is subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

1

## PARTIES

6.      Plaintiff Valerie Morrison is a resident of San Diego, California.

7.      Defendant Johnson & Johnson Consumer Inc. is a New Jersey corporation with its principal place of business in Skillman, New Jersey.

## FACTS

### I.      J&J MARKETS TYLENOL CONTAINING TITANIUM DIOXIDE

8.      In 1955, McNeil Laboratories introduced TYLENOL ® Elixir for children, the first aspirin-free pain reliever.[1] The active ingredient in Tylenol is acetaminophen. Originally, Tylenol Elixir was available by prescription only. In 1959, however, J&J acquired McNeil Laboratories, and the following year, Tylenol was approved for sale without a prescription.

9.      Today, Tylenol products are ubiquitous, available for purchase at nearly any brick-and-mortar or online retail outlet, not just pharmacies and grocery stores.

10.     Many varieties of Tylenol that J&J markets contain titanium dioxide ($TiO_2$), a substance that, due to its opacity and light-reflecting characteristics, is used to enhance the whiteness of paint, plastics, paper products—and certain foods and drugs.

11.     J&J markets a wide variety of Tylenol-branded products. At least the following varieties contain $TiO_2$ as an ingredient.[2]

> a.      Tylenol Extra Strength
>
> b.      Tylenol Extended Release
>
> c.      Tylenol Cold + Flu Multi-Action
>
> d.      Tylenol Cold + Flu Severe
>
> e.      Tylenol PM
>
> f.      Tylenol Rapid Release Gels
>
> g.      Tylenol Regular Strength Liquid Gels

---

[1] *See* https://www.tylenol.com/news/about-us

[2] To the extent there are additional Tylenol varieties containing $TiO_2$ as an ingredient, they should be read to be a part of this Complaint.

## II.   TITANIUM DIOXIDE PRESENTS A SAFETY RISK TO CONSUMERS

12.   The FDA last examined the risks of $TiO_2$ more than 50 years ago, in 1966, finding that it may be safely used as a color additive in foods in quantities up to 1% by weight. The consumer advocacy nonprofit Environmental Working Group, however, has called on the FDA to consider banning $TiO_2$ use in food, citing more recent concerns.[3]

13.   Studies have shown that $TiO_2$ exposure can cause pathological lesions of the liver, spleen, kidneys, and brain; lung tumors; and inflammation, cell necrosis, and dysfunction in the kidneys.[4] In light of this, the Center for Food Safety has challenged major corporations to remove $TiO_2$ from their foods.[5]

14.   In May 2019, France announced a ban on $TiO_2$ as a food additive, based on an opinion of France's food safety government agency (ANSES), recommending reducing the exposure of consumers, workers, and the environment to $TiO_2$. ANSES found there was insufficient evidence demonstrating $TiO_2$ is safe for human consumption.[6]

15.   In May 2021, the European Food Safety Authority (EFSA) similarly held that $TiO_2$ is no longer considered safe as a food additive.[7] The assessment was conducted following a rigorous methodology and taking into consideration many thousands of studies

---

[3] Graddy, S., "Study: Additive found in Skittles and Starburst no longer considered safe," (May 12, 2021), *available at* https://tinyurl.com/2s35frdf.

[4] Center for Food Safety, "Top Candy Company MARS Commits to Phasing Out Harmful Nanoparticles from Food Products" (Oct. 27, 2016) (citation omitted), *available at* https://tinyurl.com/mtf6hwbj.

[5] *See id.*

[6] *See* https://www.fas.usda.gov/data/france-france-bans-titanium-dioxide-food-products-january-2020 (last visited Aug. 26, 2022); *see also* de La Hamaide, S. "France to ban titanium dioxide whitener in food from 2020" *Reuters* (Apr. 17, 2019) *available at* https://tinyurl.com/3uwtxkku.

[7] *See* European Food Safety Authority, "Titanium dioxide: E171 no longer considered safe when used as a food additive" (May 6, 2021), *available at* https://tinyurl.com/mr34zpfs; *see also* EFSA Panel on Food Additives and Flavourings, "Safety assessment of titanium dioxide (E171) as a food additive," *EFSA Journal*, Vol. 19 No. 5 (Mar. 25, 2021).

that became available following EFSA's previous assessment of $TiO_2$ in 2016, including new scientific evidence and data on nanoparticles.[8] Based on its review, the EFSA could not establish a safe level for daily intake of $TiO_2$ in food.[9] The ban is now fully in effect as of summer 2022, following a six-month transition period.

16.   The concerns of $TiO_2$ relate to its accumulation in and toxicity to the human body, particularly in small, nanoparticle sizes. After oral ingestion, the body absorbs $TiO_2$ nanoparticles, and they begin to accumulate. Research has shown these particles are genotoxic, meaning they are able to damage DNA, the genetic material of cells, which can lead to carcinogenic effects.[10]

17.   Nanoparticles of $TiO_2$ are also recognized and taken up by immune cells and can trigger an inflammatory response.[11] Solid particles, once in the sub-mucosal tissue, are able to enter both the lymphatic and blood circulation.[12]

18.   Size distribution analyses of food grade $TiO_2$ have shown that batches used in foods *always* include a fraction of nano-sized particles as an inevitable byproduct of the manufacturing processes.[13] Thus, there will *always* be nanoparticles of $TiO_2$ available for absorption in foodstuffs that use the ingredient (including OTC medicines like Tylenol).

19.   EWG's 2020 "Food Additives State of the Science" suggested avoiding $TiO_2$ because it can increase the risk of cancer, harm the nervous system, change the body's

---

[8] *Id.*

[9] *Id.*

[10] *See* Shi, H., et al., "Titanium dioxide nanoparticles: a review of current toxicological data," *Part. Fibre Toxicol.*, Vol. 10, No. 15 (2013), *available at* https://tinyurl.com/bddatxyk; Skocaj M., et al., "Titanium dioxide in our everyday life; is it safe?," *Radiol. Oncol.*, Vol. 45, No. 4 (Dec. 2011) [hereinafter "Skocaj (2011)"], *available at* https://tinyurl.com/ywyhydvn.

[11] Skocaj (2011), *supra* n.10.

[12] *Id.*

[13] Winkler, H., et al., "Critical review of the safety assessment of titanium dioxide additives in food," *J. Nanobiotechnology*, Vol. 16, No. 51 (June 1, 2018).

hormonal balance, and affect the immune system.[14] EWG stated, "We're publishing the guide because the Food and Drug Administration's regulatory approach to food additives does not consider the latest science on the health harms caused by additives that may be legally added to processed foods manufactured in the U.S."[15]

20.    In sum, $TiO_2$ particles are "without doubt" associated with the hazardous properties of cell damage, genotoxic effects, inflammatory responses, and changes in cell signaling.[16] Researchers have thus cautioned that $TiO_2$ should be used with great care, particularly in food and cosmetics: **"The least that should be done for the consumer is that a declaration of nano-sized $TiO_2$ in [ ] products is obligatory, so that we will have the choice whether to use it or not."**[17]

21.    As a global corporation in the business of manufacturing and marketing consumer health products, J&J is aware of the safety concerns posed by $TiO_2$. In fact, as early as 2013, a "Medical Professional at Johnson & Johnson,"[18] Jieqiong Hu, co-authored and published a study that examined the inhalation toxicology of nano-$TiO_2$ in ApoE knockout mice.[19] The study found that after six weeks of treatment, there was significant difference between the high dose $TiO_2$ group and control group, showing that "nano-TiO2 particles induced considerable systemic inflammation, endothelial dysfunction and lipid metabolism dysfunction, contributing to the progression of atherosclerosis."[20]

---

[14] *See* https://www.ewg.org/research/food-additive-science

[15] *Id.*

[16] Skocaj (2011), *supra* n.10.

[17] *Id.*

[18] *See* https://www.researchgate.net/profile/Jieqiong-Hu-2

[19] *See* Hu, J., "Cardiovascular Effects of Pulmonary Exposure to Titanium Dioxide Nanoparticles in ApoE Knockout Mice," J. Nanoscience & Nanotechnology, Vol. 13, No. 5 (May 2013).

[20] *Id.*

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

### III.   J&J'S TYLENOL LABELING VIOLATES CALIFORNIA & FEDERAL LAW

### A.   J&J's Marketing of Tylenol Containing TiO₂ is Likely to Mislead Reasonable Consumers

22.    Consumers are increasingly seeking products with non-toxic ingredients. For example, a July 2017 consumer survey of over 1,600 consumers, conducted by "Made Safe" and "Safer Chemicals, Healthy Families," found that 70% prioritize "free of certain toxic chemicals" and "health/safety of the product" when shopping.[21]

23.    Despite knowing that safety concerns with additives are material to reasonable consumers, J&J regularly and intentionally omitted, and continues to omit, material information regarding safety concerns associated with consuming the TiO₂ in Tylenol. Nowhere on the label of Tylenol containing TiO₂ does J&J disclose those safety concerns.

24.    To the contrary, J&J's labeling and public statements suggest Tylenol containing TiO₂ is "safe and effective when used as directed," as in the following "FAQ" on J&J's website:



---

[21] *See* https://www.madesafe.org/what-shoppers-want

25.     Publicly, J&J claims that "Nothing is more important to us than the health and safety of the people we love. We're like you in that way. And we're relentless about it. That's why we make sure our products meet or exceed applicable regulations wherever they are sold. We're all about earning the trust of millions of consumers around the world. And we've been doing it for over 100 years."[22]

26.     J&J further claims to have "A tireless passion for product safety," with "experts [ ] continuously monitoring and adjusting the process based on the latest research, guidance, regulations, and customer and consumer feedback."[23] J&J acknowledges "Safety starts with ingredients," and claims "Our ingredients are screened for quality, manufacturing process, government regulations, published research, and our own internal ingredient safety databases."[24] J&J further reassures consumers that "Everything we do is driven by the safety of consumers, the well-being of animals and the health of our planet," and promises them "confidence and peace of mind about the products they choose for themselves and their families"[25]

27.     Also on its website, J&J has a page dedicated to discussing its "Ingredients," where it again reassures consumers of the safety of its products. J&J states "When selecting ingredients, we use only the amounts that are determined to be safe and well tolerated, and the final products are formulated and tested to minimize risk. Additionally, when we select our ingredients, we find and use the best that nature has to offer and also create in the lab ingredients that are designed to be pure and reliable."[26]

28.     J&J's website also has an "Ingredient Glossary" allowing consumers to "browse some of the ingredients we commonly use in our cosmetics and personal care products,"

---

[22] https://www.jnjconsumerhealth.com/our-commitment

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] https://www.jnjconsumerhealth.com/our-commitment/ingredients

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

stating that "These ingredients[] [are] always used at safe levels . . . ."[27] The ingredient glossary lists Titanium Dioxide being used as an "Opacifying Agent" that "Helps give our products an opaque appearance . . . ."[28] But J&J does not disclose in this glossary that $TiO_2$ is used to color certain Tylenol products bright white.

29.    Thus, J&J goes out of its way to reassure consumers of the safety of its products, including the Tylenol products, despite knowing the dangers of consuming the $TiO_2$ contained therein.

30.    J&J is under a duty to disclose this information to consumers because (a) J&J is revealing some information about its Tylenol products—enough to suggest they are safe—without revealing additional material information regarding safety concerns with the products' $TiO_2$; (b) J&J's deceptive omissions concern human health, and specifically the detrimental health consequences of consuming its Tylenol containing $TiO_2$; (c) J&J was in a superior position to know of the dangers presented by the $TiO_2$ in its Tylenol, as it is a leading worldwide pharmaceutical and consumer goods company; and (d) J&J actively concealed material facts not known to Plaintiff and the Class.

**B.    Tylenol Containing $TiO_2$ is Unlawfully Misbranded**

31.    The Tylenol labeling at issue violates the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 *et seq.*, for example, because its "label is false or misleading in any particular," *see id.* § 352(a)(1) ("Any drug or device shall be deemed to be misbranded— if its label is false or misleading in any particular.").

32.    By omitting material information regarding safety concerns associated with consuming $TiO_2$, J&J also "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Specifically, J&J represented

---

[27]    https://www.jnjconsumerhealth.com/commitment/ingredients/ingredient-glossary   (last visited Aug. 29, 2022).

[28] *Id.* TiO2 is also used by J&J "as a Sun Filter in some products," *i.e.* as a sunscreen. *Id.*

through omission that Tylenol is safe when used as directed, while failing to disclose that consuming one of its ingredients, $TiO_2$, can have detrimental health consequences by causing pathological lesions of the liver, spleen, kidneys, and brain; lung tumors; and inflammation, cell necrosis, and dysfunction in the kidney.

33.     Further, J&J failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of 21 C.F.R. § 1.21(a)(2). Namely, J&J failed to disclose the harm to the body's immune system, digestive system, nervous system, respiratory system, and urinary system that is likely to result from the consumption of Tylenol in the customary and prescribed manners.

34.     The Tylenol labeling at issue further violates California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food, drug and cosmetic labeling requirements as its own. *See e.g.*, *id.* § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular."); *id.* § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."); *id.* § 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised.").

## IV.    PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

35.     As best she can recall, Plaintiff has been purchasing and regularly using Tylenol products for many years, since at least 2012, typically purchasing the product at least a few times each year. This specifically includes Tylenol Extra Strength, Tylenol Cold and Flu, and Tylenol Rapid Release Gels, typically in 100- or 225- gelcap counts. She recalls purchasing the product at stores including the CVS Pharmacy located at 1792 Garnet Ave., San Diego, CA 92109; the Rite Aid located at 1670 Garnet Ave., San Diego, CA 92109; the Vons located at 1702 Garnet Ave., San Diego, CA 92109; and the MCAS Miramar Commissary located at 2661 Moore Ave., San Diego, CA 92126.

36. When purchasing Tylenol Extra Strength, Plaintiff was seeking an over-the-counter pain reliever that was safe to consume, that is, whose regular consumption in the manner prescribed, *i.e.*, when used as directed, would not harm her bodily health or increase her risk of disease.

37. In purchasing Tylenol Extra Strength, Plaintiff had no reason to believe the product contained a chemical that presents such a danger to safety it has been banned as a food additive in Europe, and which can cause or contribute to genotoxicity and its various implications, including cancer.

38. J&J's omissions of safety concerns associated with the $TiO_2$ in certain Tylenol products were misleading, and had the capacity, tendency, and likelihood to confuse or confound Plaintiff and other consumers acting reasonably. That is because, as described in detail herein, Tylenol containing $TiO_2$ is not safe when consumed regularly, but rather can harm bodily health by causing pathological lesions of the liver, spleen, kidneys, and brain; lung tumors; and inflammation, cell necrosis, and dysfunction in the kidney.

39. Plaintiff is not a nutritionist, toxicologist, or chemical expert, but rather a lay consumer who did not have the specialized knowledge that J&J had regarding the $TiO_2$ present in certain Tylenol products. At the time of purchase, Plaintiff, like other average and reasonable consumers, was unaware of the extent to which consuming $TiO_2$, present in Tylenol Extra Strength, can adversely affect bodily health.

40. Plaintiff acted reasonably in relying on J&J's omissions, which J&J intentionally made to induce average consumers into purchasing the products, knowing they might be unwilling to purchase, or unwilling to pay as much if they knew the safety concerns associated with the $TiO_2$ in the products.

41. Plaintiff would not have purchased Tylenol Extra Strength or would not have been willing to pay as much for it, if she knew that its labeling was false and misleading in that it was not as safe as represented by virtue of J&J's omissions.

42. Tylenol products containing $TiO_2$ would have cost less absent J&J's deceptive omissions.

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

43.     Through these omissions, J&J was able to gain a greater share of the over-the-counter pain medication market than it would have otherwise, and also increased the size of the market.

44.     For these reasons, Tylenol products containing $TiO_2$ were worth less than what Plaintiff and the Class paid for them.

45.     Plaintiff and the Class lost money as a result of J&J's deceptive omissions and practices in that they did not receive what they paid for when purchasing Tylenol containing $TiO_2$.

46.     Plaintiff would purchase Tylenol products in the future if she could trust that the labeling was not false or misleading, but absent an injunction, Plaintiff will be unable to trust the labeling on Tylenol when she encounters it in the marketplace.

47.     Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely on representations such as those made by J&J with confidence, continues to be violated every time she is exposed to the misleading labeling.

48.     Plaintiff's legal remedies are inadequate to prevent these future injuries, for which prospective injunctive relief is necessary.

## CLASS ACTION ALLEGATIONS

49.     While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Tylenol products (the "Class").

50.     Plaintiff also seeks to represent a subclass of all Class Members who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified, purchased for personal or household use, and not for resale or distribution, any of the Tylenol products in California (the "Subclass").

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

51.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

52.     Questions of law and fact common to Plaintiff and the Class include:

a.      Whether J&J omitted information about the $TiO_2$ in certain Tylenol products;

b.      Whether that omission was material, or likely to be material, to a reasonable consumer;

c.      Whether the omission was deceptive;

d.      Whether J&J's conduct violates public policy;

e.      Whether J&J's conduct violates state or federal food or drug statutes or regulations;

f.      Whether J&J warranted the products as safe for human consumption;

g.      Whether the Tylenol products pass without objection in the trade or industry;

h.      Whether the Tylenol products are fit for the ordinary purpose for which they are used;

i.      Whether J&J knew or should have known that its representations and omissions were false;

j.      Whether J&J intended to induce reliance on its representations and omissions;

k.      Whether J&J was unjustly enriched by Plaintiff's and Class Members' purchases of the Tylenol products;

l.      Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief;

m.      The proper amount of damages, including punitive damages;

n.      The proper amount of restitution; and

o.      The proper amount of attorneys' fees.

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

53.     These common questions of law and fact predominate over questions that affect only individual Class Members.

54.     Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to J&J's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased Tylenol containing $TiO_2$ and suffered economic injury because the products are misrepresented. Absent J&J's practice of deceptively and unlawfully labeling the Tylenol, Plaintiff and Class Members would not have purchased the products.

55.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods.

56.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

57.     J&J has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

58.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

59.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

60.      The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

61.     The acts, omissions, misrepresentations, practices, and non-disclosures of J&J as alleged herein constitute business acts and practices.

### Fraudulent

62.     A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

63.     As set forth herein, J&J's omissions relating to Tylenol containing $TiO_2$ are likely to deceive reasonable consumers and the public.

### Unlawful

64.     The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- •     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

- •     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

- •     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

- •     The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

### Unfair

65.     J&J's conduct with respect to the labeling, advertising, and sale of the Tylenol was unfair because J&J's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its consumers.

66.     J&J's conduct with respect to the labeling, advertising, and sale of the Tylenol was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the Consumers Legal Remedies Act, False Advertising Law, FDCA, and Sherman Law.

67.     J&J's conduct with respect to the labeling, advertising, and sale of the Tylenol was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the benefit of using $TiO_2$—a brighter white coloration—does not

outweigh the harm to Class Members who were deceived into purchasing Tylenol products containing TiO$_2$ unaware of related safety concerns.

68.   J&J profited from the sale of the falsely, deceptively, and unlawfully advertised Tylenol containing TiO$_2$ to unwary consumers.

69.   Plaintiff and Class Members are likely to continue to be damaged by J&J's deceptive trade practices, because J&J continues to disseminate misleading information. Thus, injunctive relief enjoining J&J's deceptive practices is proper.

70.   Plaintiff has suffered injury in fact as a result of J&J's unlawful conduct.

71.   Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Tylenol, which were unjustly acquired through acts of unlawful competition.

72.   Because Plaintiff's claims under the "unlawful" and "unfair" prongs of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of J&J's challenged behavior.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

73.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

74.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

75.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

76.     As alleged herein, the advertisements, labeling, policies, acts, and practices of J&J relating to Tylenol containing $TiO_2$ misled consumers acting reasonably as to the safety of the products.

77.     Plaintiff suffered injury in fact as a result of J&J's actions as set forth herein because she purchased the Tylenol in reliance on J&J's false and misleading marketing claims stating or suggesting that the products, among other things, are safe.

78.     J&J's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because J&J has advertised Tylenol containing $TiO_2$ in a manner that is untrue and misleading, which J&J knew or reasonably should have known, by omitting material information regarding safety concerns from Tylenol's labeling.

79.     J&J profited from the sale of the falsely and deceptively advertised Tylenol to unwary consumers.

80.     As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution and an order for the disgorgement of the funds by which J&J was unjustly enriched.

81.     Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, commercial code (for Plaintiff's breach of warranty claims), and for Plaintiff's fraud claims, and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

82.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

83.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

84.     J&J's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Tylenol containing $TiO_2$ for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

   a. § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

   b. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

   c. § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

   d. § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

85.     J&J profited from the sale of the falsely, deceptively, and unlawfully advertised Tylenol containing $TiO_2$ to unwary consumers.

86.     J&J's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

87.     Plaintiff, on behalf of herself and the Class, seeks injunctive relief under Civil Code § 1782(d).

88.     In compliance with Cal. Civ. Code § 1782, Plaintiff sent written notice to J&J of her claims. Although Plaintiff does not currently seek damages for her claims under the CLRA, if J&J refuses to remedy the violation within 30 days of receiving the notice letter, Plaintiff may thereafter amend this Complaint to seek damages.

89.     Additionally, in compliance with Cal. Civ. Code § 1780(d), Plaintiff has filed an affidavit of venue concurrently herewith.

# FOURTH CAUSE OF ACTION

## Breach of Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq*., and California Commercial Code § 2314

90.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein. Plaintiff brings these causes of action on behalf of a California Subclass.

91.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790 *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

92.    The Tylenol products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

93.    Plaintiff and the Subclass Members who purchased the products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

94.    J&J is in the business of manufacturing, assembling, and/or producing the products and/or selling the products to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

95.    Defendant impliedly warranted to retailer buyers that the Tylenol at issue was merchantable in that the products would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the products are used.

96.    For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. J&J breached these implied warranties because the Tylenol products at issue were unsafe for human consumption. Therefore, the products would not pass without

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

97.   Plaintiff and Subclass Members purchased the Tylenol products at issue in reliance upon J&J's skill and judgment in properly packaging and labeling the products.

98.   The products were not altered by Plaintiff or the Subclass Members.

99.   The products were defective at the time of sale when they were in the exclusive control of J&J. The issue as described in this Complaint was latent in the product and not reasonably discoverable at the time of sale.

100.   J&J knew that the Tylenol products at issue would be purchased and consumed without additional testing by Plaintiff and Subclass Members

101.   As a direct and proximate cause of J&J's breach of the implied warranty, Plaintiff and Subclass Members have been injured and harmed because they would not have purchased the products if they knew the truth, namely, that they were unfit for use and posed a significant safety risk.

102.   Plaintiff and the Subclass seek compensatory damages, attorneys' fees, costs, and any other just and proper relief available under law.

### FIFTH CAUSE OF ACTION

### Fraud

103.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

104.   At the time Plaintiff and Class Members purchased the Tylenol products at issue, J&J did not disclose the dangers associated with consuming $TiO_2$, but instead concealed them and misrepresented the products as safe for human consumption.

105.   J&J knew that its omissions and misrepresentations regarding the products were material, and that a reasonable consumer would rely upon its omissions and misrepresentations in making purchasing decisions.

106.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the products.

107.   Plaintiff and Class Members were reasonable in relying on J&J's omissions in making their purchasing decisions.

108.   Plaintiff and Class Members had a right to rely upon J&J's omissions as it maintained exclusive or superior control over knowledge of the true nature and quality of the Tylenol products at issue.

109.   Plaintiff and Class Members sustained damages as a result of their reliance on J&J's omissions, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## SIXTH CAUSE OF ACTION

### Fraudulent Inducement

110.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

111.   J&J did not disclose, but instead concealed material information about the Tylenol products at issue, as discussed herein.

112.   J&J knew, or should have known, that the products were falsely and misleadingly portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

113.   J&J also knew that its omissions regarding the products were material, and that a reasonable consumer would rely on its omissions in making a purchasing decision.

114.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the products.

115.   Plaintiff and Class Members were reasonable in relying on J&J's omissions in making their purchasing decisions.

116.   Plaintiff and Class Members had a right to rely on J&J's omissions as it maintained exclusive or superior control over the products, and what information was available regarding the products.

117.   Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the products based upon its omissions.

20

118.   Plaintiff and Class Members sustained damages as a result of their reliance on J&J's omission, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Fraudulent Omission or Concealment

119.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

120.   At all relevant times, J&J was engaged in the business of designing, manufacturing, distributing, and selling the Tylenol products at issue.

121.   J&J, acting through its representatives or agents, delivered the products to its distributors and various other distribution channels.

122.   J&J willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the products as discussed herein.

123.   Rather than inform consumers of the truth regarding the Tylenol products, J&J misrepresented the quality of the products as discussed herein at the time of purchase.

124.   J&J made these material misrepresentations to boost or maintain sales of the products, and to falsely assure purchasers of the products that J&J is a reputable company and that its products are safe for consumption. The false representations were material to consumers because the omissions played a significant role in the value of the products purchased.

125.   Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the products, as discussed throughout. Plaintiff and Class Members had no way of knowing J&J's omissions as to the products and had no way of knowing that J&J's omissions were misleading.

126.   Although J&J had a duty to ensure the safety, completeness, and accuracy of the information regarding the products, it did not fulfill this duty.

127.   J&J omitted or concealed material facts partly to pad and protect its profits, as it saw that profits and sales of the products were essential for its continued growth and to

maintain and grow its reputation as a premier designer and vendor of the products. Such benefits came at the expense of Plaintiff and Class Members.

128. Plaintiff and Class Members were unaware of these material omissions, and they would not have acted as they did had they known the truth. Plaintiff's and Class Members' actions were justified given J&J's omissions. J&J was in exclusive or superior control of material facts, and such facts were not widely known to the public.

129. Due to J&J's omissions and misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the products that did not live up to their advertised representations. Plaintiff and Class Members are entitled to recover full refunds for the products they purchased due to J&J's omissions.

130. J&J's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers. J&J's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. J&J's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**EIGHTH CAUSE OF ACTION**

**Quasi-Contract/Unjust Enrichment**

131. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

132. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

133. Plaintiff and Class Members conferred benefits on J&J by purchasing the Tylenol products at issue.

134. J&J was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the products. Retention of those moneys under these circumstances is unjust and inequitable because J&J failed to disclose that the products were unfit for their intended purpose as they were unsafe for use. These omissions caused injuries

to Plaintiff and Class Members because they would not have purchased the products if the true facts were known.

135.    Because J&J's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

136.    Because the Court has broad discretion to award restitution and could apply a standard different than that applied to assessing damages under the CLRA, or for Plaintiff's breach of warranty and fraud claims, and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and for breach of warranty and fraud are more limited than the equitable remedies available for unjust enrichment, and are therefore inadequate.

137.    Additionally, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from her purchase of the products is determined to be an amount less than the premium price of the products. Without compensation for the full premium price of the products, Plaintiff would be left without the parity in purchasing power to which she is entitled.

138.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure Plaintiff is in the same place she would have been in had J&J's wrongful conduct not occurred, *i.e.*, a position to make an informed decision about the purchase of the products absent omissions and misrepresentations with the full purchase price at her disposal.

## **PRAYER FOR RELIEF**

139.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against J&J as to each and every cause of action, and the following remedies:

a.   An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

b.   An Order requiring J&J to bear the cost of Class Notice;

c.   An Order compelling J&J to conduct a corrective advertising campaign;

d.   An Order compelling J&J to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending Products;

e.   An Order requiring J&J to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

f.   An Order requiring J&J to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.   An Order requiring J&J to pay compensatory damages and punitive damages as permitted by law;

h.   An award of attorneys' fees and costs; and

I.   Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

140.   Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 29, 2022          /s/ Jack Fitzgerald

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT

*Morrison v. Johnson & Johnson Consumer Inc.*, Case No.
CLASS ACTION COMPLAINT

*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiff***

25